IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

RALPH HARRISON BENNING : 5:18-cv-87-TES
Plaintiff
VS. : February 10, 2026

COMMISSIONER TYRONE OLIVER, : Macon, Georgia
GEORGIA DEPARTMENT OF
CORRECTIONS INMATE EMAIL :
CENSOR, MARGARET PATTERSON,
JENNIFER EDGAR. :
Defendants

TRANSCRIPT OF SHOW CAUSE HEARING
BEFORE THE HONORABLE TILMAN E. SELF, III,
UNITED STATES COURT DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: PRO SE
RALPH BENNING

FOR THE DEFENDANTS: ELIZABETH CROWDER
DEPT OF LAW-03
40 CAPTIAL SQ, SW
ATLANTA, GA 30334

ALSO PRESENT: COMMISSIONER TYRONE OLIVER
JENNIFER AMMONS

TAMMY W. DIROCCO, USCR
P.O. BOX 539
MACON, GA 31202-0539
(478-752-3497)

February 10, 2026
10:00 a.m.
Macon, Georgia

P R O C E E D I N G S

CSO OFFICER: All rise. The United States District Court for the Middle District Georgia, Macon Division, is now in session. The Honorable Judge Self presiding.

THE COURT: Good morning, everybody. Have a seat. Thank you.

This is Case No. 5:18-cv-87, *Ralph Harrison Benning v. Commissioner Tyrone Oliver, et al*.

We are here on a show cause hearing. And I guess I would just say I just can't believe that we're here. I can't believe my time and the Court's time and the people's time is going to be wasted, once again, because the Department of Corrections is incapable of following simple, tiny orders. But here we are once again.

As I understand it -- we're going to hear in a minute, I hope -- the Court had issued an injunction, told the Department of Corrections not to keep -- or to stop following certain policies regarding emails. And this was the same game that was played -- the procedural gamesmanship that was played during the actual trial of the case where, as I recall it, the Department said, "Oh, we're not doing that anymore."

Mr. Benning relies upon that. He drops his claim.

And then once he drops his claims, then the Department goes back and starts reinstituting the same policy again.

And then the Department is upset because I now let Mr. Benning reassert that claim, if you will, even though they said they weren't going to do it.

And then it turns out I rule in favor of Mr. Benning, the Circuit confirms it, is my understanding, and the Department ignores the order. Blows it off. Am I right, Mr. Benning?

MR. BENNING: Yes, sir.

THE COURT: Are they still ignoring the orders?

MR. BENNING: Ms. Crowder has represented to me --

THE COURT: I don't care about that. I'm asking you.

MR. BENNING: I don't personally know because I haven't had access to a kiosk.

THE COURT: Why not?

MR. BENNING: Well, shortly after I filed this motion, the prison came in and disabled the kiosk in my dormitory.

THE COURT: Right.

MR. BENNING: And the only kiosk I've had access to is an education-only kiosk, which doesn't -- so I don't know.

THE COURT: I see.

MR. BENNING: I don't know personally.

THE COURT: Well, are you allowed to go to any other dormitories to try to figure out if this is retaliatory against you?

MR. BENNING: The way the system is set up, if I'm not assigned to a dormitory for 24 hours, I can't access the kiosk. There is a kiosk in visitation, but I can't access it.

THE COURT: Okay. So it very well could be that other prisoners, right outside in a different section, could be able to do -- access their email kiosk?

MR. BENNING: Yes. I've asked, but the ones I've asked said they don't use the email.

THE COURT: I see. All right.

Who is here for the Department?

MS. CROWDER: Elizabeth Crowder from the Attorney General's Office.

THE COURT: Good morning.

MS. CROWDER: Good morning, Your Honor. To my left is Commissioner Tyrone Oliver.

THE COURT: Okay.

MR. OLIVER: Good morning.

THE COURT: Anybody else here today?

MS. CROWDER: Yes, Your Honor. Jennifer Ammons, who's the in-house general counsel for the Department of Corrections, as well.

THE COURT: Okay. Ms. Crowder, I'm glad to hear

from you.

MS. CROWDER: Well, Judge, I appreciate the brief history that you put on the record of this case. I understand the Court's perspective on this. Taking that into account, recognizing that there is little, if no, excuse for failing to comply with the court order -- there are explanations that can be offered as to various and sundry things, but quite frankly, there's little or no excuse for failing to comply with the court order.

What we have done since Mr. Benning's filing -- and I wasn't unaware of what Mr. Benning just offered to the Court. Mr. Benning and I communicate on a regular basis. So I can certainly take the time to find out what's going on with the kiosk in Mr. Benning's dorm. But all of that being said, subsequent, as the court is aware and the response that was filed, the Commissioner has instructed the JPay, which is the organization that manages the email kiosk on behalf of the Department, to cease using any format that they might have that would interfere with that process. And there's also been a directive in writing from the Department to all the wardens and all superintendents directing that they no longer -- specifically no longer enforce that provision of the policy.

I recognize both of those things were done subsequent to Mr. Benning's filing, but Mr. Benning's relief sought is remedial action. And the only other thing I can

think of to do, Judge, is to offer to the Court -- which I've already given Mr. Benning a copy of the policy information bulletin that was issued in January of this year, instructing that that policy provision specifically subject to the Court's order no longer be enforced.

I have spoken with the Commissioner as well, as recently as this morning, recognizing that this may not alleviate some of the Court's concerns, in light of the Court's reference to gamesmanship and things of that type that --

THE COURT: I can just tell you -- I can just tell you -- and I'm glad to put the Commissioner under oath, for what's that worth, and let him tell me what he wants to tell me, and he probably should.

But I want to be very clear -- I wanted the Commissioner in person here because I want him to hear it from my mouth. I want to look him in the eyes. I cannot -- I'm incapable -- I don't have the mental ability or the communication necessary to put into words how little credibility the Department of Corrections has. It is shocking to me.

If -- it's unbelievable to me that someone in the United States would have an order from the Eleventh Circuit -- forget me -- just the Eleventh Circuit, the second highest court in the country, and they just ignore it. Just blow it

off. It's no big deal. They'll do what they want to do.

And I'm telling you -- I was reading, before I came here, Judge Treadwell's order finding the Department of Corrections in contempt. In contempt. Heads should hang in shame over that. But it's the same type of thing. We're going to put -- just remove some signs on the wall from 2019 to about 2025. The signs don't get removed. It's just like the Department thinks that they can do anything they want to do. It is not going to happen. I am dug in now. I am absolutely 100 percent dug in.

I would love to know what would happen to one of these guards right here if they just ignored that Commissioner for six months. I would love to. They'd get fired. They'd be fired.

MS. CROWDER: That's a reasonable expectation, Judge.

THE COURT: That is the understatement of the year. That is diplomacy in action right there.

I can't tell you -- you know, we hear all this stuff about the prison system, and I get all these letters from inmates. And, listen, I take a lot of this with a grain of salt. I do.

I don't believe everything that an inmate writes to me about. But when you get enough of them over time with a geographic survey, there's a lot of truth out there to what's

being said.

I just can't believe that the Commissioner would just ignore a court order. I can't believe it.

If this was a child support case, if I were back in Superior Court, he'd be in jail. He'd be going under the clock today. I don't get it.

But I would love to hear from somebody to explain to me why this -- I don't know if it's just a culture that the Department of Corrections has decided that they're above the law, which is really an interesting concept, but that's what it appears to me. But they are not. The Commissioner is not. They are not.

MS. CROWDER: I can assure you, Judge, there is nobody here who's going to testify on behalf of the Department of Corrections or anyone else that the Department of Corrections believes that they're above the law and that ignoring a court order is --

THE COURT: They may not say that. They may not say that with words.

MS. CROWDER: I understand, Judge.

THE COURT: Their actions tell a very different story. Let me hear from the Commissioner. I'm glad to hear from him.

MS. CROWDER: Okay.

THE COURT: Sir, come on up.

MR. OLIVER: You want me up there, sir?

THE COURT: Yes, sir.

COURTROOM DEPUTY: Do you solemnly swear that your testimony in this case shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, ma'am, I do.

THE COURT: You can ask him any questions, and then I'll take over. Go ahead.

TYRONE OLIVER

Whereupon, witness, having been duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. CROWDER:

Q Good morning, sir.

A Good morning.

Q Mr. Oliver, you're the Commissioner for the Georgia Department of Corrections?

A That's correct. Yes, ma'am.

Q And you're familiar with Mr. Benning, who is the petitioner in this movement here that we're -- the motion that we're here for today?

A First time I've seen him in person, but yes, I'm familiar with his name.

Q Okay. But you're familiar with the reason we're here?

A Correct.

Q You're familiar with the Court's order from November of 2025?
A Yes.
Q Did you see that court order?
A I saw it in an email in, I think, November, somewhere in November. It was a correspondence, yes.
Q Okay. And what action did you take when you got that court order?
A From my understanding, from the correspondence in the email, that it was still pending. There were motions to be filed, and they would get back to me when we heard something back from the Court is what the email said.
Q And that would be the legal department?
A Correct.

MS. CROWDER: Go ahead, Judge.

THE COURT: All right. Hold on a second.

Ms. Crowder, I don't understand. What motions were there to be done then? I thought the case had come back from the Circuit.

MS. CROWDER: The case has gone up on appeal twice, Judge.

THE COURT: That's right.

MS. CROWDER: Right. And at the time that the order came out -- I'm assuming what he's referring to is that that second appeal had gone up on appeal at the time. Because that

appeal and that petition for rehearing en banc is still pending on the second appeal that went up. That hasn't come out yet. There has been no movement on the petition for rehearing en banc. And there is an order from the Eleventh Circuit, but there has been no movement on that petition. That remains pending, to the best of my knowledge, still today, Judge.

THE COURT: Okay.

MS. CROWDER: Therefore, I'm assuming that the motions he's referring to -- when I said "motion," I was referring to Mr. Benning's motion for the --

THE COURT: For the show cause?

MS. CROWDER: Yes, sir.

THE COURT: I understand that. I'm trying to figure out what --

MS. CROWDER: I think the procedural part is probably a little over -- no offense intended, Mr. Oliver, but from a legal, procedural perspective, I think that's probably a little outside the scope of Mr. Oliver --

THE COURT: Right.

MS. CROWDER: -- which is why we have Ms. Ammons here. But in terms of his knowledge of the order -- I mean, since that's why we're here, I just wanted to make sure the Court was aware that he saw the order and then his next step was to contact his legal department.

THE COURT: Okay. Mr. Benning, do you have a case pending in the Court of Appeals? It's Case No. 24-14122.

MR. BENNING: I believe so. I don't know the number right off the top of my head. But I believe there's one -- there is one in the Eleventh Circuit.

THE COURT: Well, there's an oral argument scheduled for March 24th of 2026.

MR. BENNING: I haven't received any notice of that yet.

THE COURT: Do you have counsel on that case like you had on this one?

MR. BENNING: Yes, sir.

THE COURT: Same folks out of Vermont?

MR. BENNING: No. It's a group called -- a law firm named Orrick. I believe they're out of California.

THE COURT: I got you.

MS. CROWDER: There is another appeal pending and involves our office, Your Honor. I wasn't aware of an oral argument. I know it's in the current status of the appellee's brief is due. It's a case involving Judge Treadwell.

THE COURT: Judge Treadwell can more than adequately handle his stuff. I'm just trying to figure --

MS. CROWDER: Yeah, no. I just didn't want to misrepresent that there was no other -- there definitely is an appeal pending. It relates to the food adequacy and Muslim

and vegan and kosher meals. And that case is up on appeal. I know it's in the process of briefing. That may be the other appeal case number.

THE COURT: It might be. It very well could be. I'm not sure at all.

Commissioner, do you have any idea what's going on about Mr. Benning says -- is that after this order came out -- or excuse me -- after he filed his motion to show cause, that coincidently, the kiosk in his dormitory is disabled?

MR. OLIVER: No, sir, I don't. I don't have a clue.

THE COURT: Who would be the person that would know that?

MR. OLIVER: I can check with the warden at his prison.

THE COURT: Well, I think you should because -- I think you should, is what I think you should do. And if that's really true, you know, the two-year statute -- we're going to have another lawsuit for retaliation on there.

Yeah, you've got oral argument on March 27th, Mr. Benning.

MR. BENNING: Thank you.

THE COURT: I don't know who your lawyers are. Apparently, y'all's lawyers are somebody named John Henry Thompson.

MS. CROWDER: He's the newest solicitor general for

our office, Judge. He just joined the firm.

THE COURT: Okay. All right.

MS. CROWDER: To the extent it's a firm. But he just joined our office.

THE COURT: He's the solicitor general for the State of Georgia.

MS. CROWDER: He is now, yes. He just started. He took Mr. Petrany's position as of the first of this year.

THE COURT: Well, March 27th, he's got somewhere to be, in case y'all didn't know.

MS. CROWDER: I'll make sure he knows.

THE COURT: Commissioner, I don't understand -- I'm just having a hard time understanding why it appears to me that it is just so hard for the Department to follow orders. If the Eleventh Circuit tells me to do something, I just don't get the luxury of not doing it. I don't understand how you do.

MR. OLIVER: You're right, sir. And I can tell you this: From the time that I -- when I was informed that there was an order to be enforced, I immediately instructed my team to get with JPay and turn on the email access. And that was sometime -- it was at the end of -- I think it might be before New Year's or -- it was after Christmas, definitely, because I was on vacation.

THE COURT: Well, that's just too long. It's just

too long. I don't know if -- I know that you're running a big bureaucracy. I understand that. But you're the man in charge, and that's why I wanted you here, because I don't know what people tell you or don't tell you or if this is your directive or not. I don't know.

But this is my frustration, right. So I read the contempt order in *Gumm* and I read what Judge Treadwell lays out in excruciating detail of just simple things that can't get done.

And I have another case, *Moore v. Smith*, 5:25-cv-132. *Moore v. Smith*, we have a situation where a prisoner says that his appeal -- he wants to file a lawsuit. The Department defends it on the basis of lack of administrative exhaustion. The prisoner tells us that he had filed an emergency grievance. The Department of Corrections now swears, swears under oath with an affidavit from an employee, that there is no such grievance. Nothing like this exists. Judge Weigle believes the Department of Corrections. I believe Judge Weigle. We go to the Circuit. The Circuit reverses us.

And let's be -- just to make sure anybody that's here -- it's not the fact that we get reversed, right. Once you get reversed once, it doesn't hurt anymore. It's just that first time hurts your feelings. After that, it doesn't matter.

But the Circuit says, "No, District Court, you should have held a hearing on this. You should not have just ruled on paper. You should have had a hearing." We, in contrast to the DOC, hold a hearing, and lo and behold, here is the piece of paper with emergency grievance on there. So we've got people who are just lying under oath. I mean --

I truly -- I'm not trying to be dramatic or hyperbolic. I'm telling you my -- this is me. I'm not speaking for any other person in this courthouse but me. Not Judge Treadwell, not Judge Royal, nobody else, just me. I think the Department of Corrections would rather lie, even if the truth fits better. And here is Exhibit A. And then we get a court order, and it is just not followed.

I know you're a smart man and you can tell how frustrated I am.

MR. OLIVER: Yes, sir.

THE COURT: I don't know what to do. I don't know what to say. I'm exacerbated. I'm just put out. I just don't understand.

I think you've got a lot of cases. And I know the Attorney General's Office and the SAGs handle a lot of cases. I get that. It's half of our docket are cases involving prisoners. But it ought to just go without saying you've got to do what the Court says.

MR. OLIVER: Absolutely.

THE COURT: You've just got to do what they say on that.

Mr. Benning, what other problems are you having with this case? Or is this it?

MR. BENNING: I still don't know if they have done anything on the setting up of a system to where if they decide to censor an email.

THE COURT: Yeah, but you know -- listen, I think we all understand that -- I think the Court was pretty clear to me, though maybe I got it wrong, but they don't have to have an email system.

MR. BENNING: Right.

THE COURT: They can shut the whole thing down.

MR. BENNING: Agree.

THE COURT: And if they do that, that's on them. I can't help you anymore, and that is just what it is. But I agree with you: If they are going to have an email system, they have to comply with the Circuit order that required a separate independent -- sort of an appellate right that another decision-maker, other than the one who censored that email, has to weigh in and you've got to have notice and a chance to weigh in on that.

MR. BENNING: Yes, sir.

THE COURT: That's my understanding.

MR. BENNING: That's the only other thing I don't

know about.

THE COURT: Well, and I'm assuming the reason you don't know about that is because the kiosk has been disabled.

MR. BENNING: And I can't send any emails. Yes, sir.

THE COURT: Right. Yes, ma'am.

MS. CROWDER: Excuse me, Judge. My understanding, Mr. Benning -- I just want to be clear. The kiosk being disabled, according to what you said earlier, was just a recent thing; correct?

MR. BENNING: Okay. This kiosk was disabled -- right -- shortly after I filed this motion.

MS. CROWDER: Right. So before that, were you having -- and I apologize for interrupting the Court.

THE COURT: Go right ahead. Because you're just asking what I want to know, so go right ahead.

MS. CROWDER: Before that, you were sending emails. Have you received any indication that your emails are being censored?

MR. BENNING: No. And I haven't sent that many emails either.

MS. CROWDER: Right. But you have had access, and you haven't received any indication that some email you sent was not sent?

MR. BENNING: I haven't until now. No.

MS. CROWDER: Thank you.

THE COURT: Mr. Benning, do you have any way of knowing if this artificial 12-person limit -- has that been removed?

MR. BENNING: I personally do not know.

THE COURT: Ms. Crowder, do you know?

MS. CROWDER: I believe that the -- well, yes, Judge. If I may approach, and I'm --

THE COURT: You may.

MS. CROWDER: -- more than happy to provide -- as I said, I've given a copy of this to Mr. Benning already to take with him back to the facility -- this is the policy information bulletin that was put in place by the Department. As I say, it wasn't done until January of this year, but it is in place.

And the one thing that I was speaking with Commissioner Oliver about prior to Your Honor taking the bench was the possibility of modifying this to make it even more clear that this policy information bulletin must remain in full force and effect as long as this court order is in place. In the event that Mr. Oliver were to be substituted for another commissioner, we don't want anybody else coming in behind him and making an assumption that they can make another policy bulletin and change things back. So the Commissioner and I were discussing that that might be one more step we

could take to make absolutely certain that the shenanigans, as you refer to them, never come up again in this particular case.

THE COURT: Well, it just appears to me that -- I guess, just looking at this case alone -- I don't know -- I mean, we complain about jailhouse lawyers, right, all the time. I do. Courts do, complain about jailhouse lawyers, right. So the inmates who thinks they're lawyers, but they're really not, and they're terrible at it, and they give bad legal advice to their friends. You know, we can all cite hundreds of those.

But sometimes I think we have wardens who are jailhouse lawyers, and they just decide, "Okay" -- it's kind of like -- it gets frustrating to me where a guy has a problem with medical, and then, coincidentally, he files a lawsuit, and before the answers can be filed, he's transferred to another prison and then to another prison and then to another prison and then to another prison.

I understand the games that are played. I get all that. It's that kind of stuff that just -- the credibility of the Department is just shot because of those kind of things.

And then you see it, too, the same prisoner, when he moves to this -- he wants this problem attended to over here. And, again, I'm not the bleeding heart that wants everybody to live in, you know, a Norwegian-type, Western European prison

where we hold hands and they have play rooms with bunnies and stuff. I'm not that guy. But some of the stuff is just cruel. But then we just move them around, and so it never gets tended to. That's the kind of stuff.

And I'm saying -- just like this case right here. File a suit. We'll pull out the whole thing. Great. I say "the whole thing." We'll just pull the whole email system. Great. You can do that. That's fine. But then change it once the case goes up on appeal. Literally within days. I mean within days, the Department starts doing it again.

So this case is at the top of my list. I am interested -- if y'all can't figure that out -- and I'm going to stay interested in it.

MS. CROWDER: I understand, Judge.

THE COURT: And every other one. I think now what you're probably going to see -- and I think a lot of the realities of this is -- I know for me, personally -- I don't know about any other judge in this district -- but for me, personally, I mean, the days of the Department getting the benefit of the doubt are gone. They are just gone.

So we can hold hearings all day. We'll keep the courthouse open all night. It doesn't bother us to have hearings. And it's just so unnecessary. All of this is just so unnecessary, in my book.

Like I said before, there's no question in my mind

you wouldn't put up with folks just ignoring your directives, but they are. There are people out there who are ignoring your directives, in my opinion, on that.

Obviously, Mr. Benning's motion is going to be granted. They're going to enforce it, period, on that.

Other than that, Commissioner, I don't know what to say to you. But I want you to understand -- I wanted you to hear it from me man to man how I feel and why I feel that way. And you may fully disagree with it, and that's your right as a God-fearing American to do that, but I wanted you to hear it from me. I didn't want it to have to be filtered through lawyers or anybody else. I wanted you to hear it from me, and I wanted to shoot straight with you and tell you how I feel and what I think about this. I intend to see it through.

MR. OLIVER: Yes, sir.

THE COURT: I mean, I'm dug in hard. I hope -- I hope the Speaker and the Lieutenant Governor and the Governor hear about it because they need to understand that there is a real problem, a true problem in the Department, in my opinion.

That's all I've got for you. Thank you. This ain't a one-way street. You can say anything you want to say. I'm not trying to -- the same fish in a barrel here. You can say anything you want to say on that, and I'm man enough to hear it and take it.

MR. OLIVER: Yes, sir. No, I was just saying I hear

your frustrations and I feel the same. I voiced those concerns.

I will tell you this: that, you know, I hold my people accountable. So anytime that I hear anything or anything is out of place, I make sure they are held accountable. And I can assure you and I can assure this Court that if it's anything that was done to Mr. Benning's point, any type of retaliatory of any nature with the kiosk, I'm going to hold the people accountable. I've done so for the past three years I've been in this seat. I make sure that when things come to my attention, that come to my desk, I handle it, and I handle it accordingly in a timely manner and doing things right.

Again, there's no excuse for this, other than the fact that when I was notified about it, I took immediate action at that time.

THE COURT: And all that very well may be true. What I'm telling you, though, is there is a problem of it getting to your desk. You know, you can't be in 43 different prisons trying to resolve, God knows, 500 lawsuits probably at any time.

MR. OLIVER: Yes, sir.

THE COURT: In just federal court, not to mention state court.

I mean, the Attorney General's Office is, you know

-- they've got a whole wing over there devoted to this kind of stuff.

My point simply is I don't know if folks are using bad judgment and not getting stuff to your desk right or they're not using good judgment in solving problems that should never have to hit your desk. I don't know. I meant what I said; there is no reason that your time should be wasted today. The people of Georgia, the citizens who pay your salary, are not getting their money's worth from you today, and it's not your fault. It's the United States' fault -- well, I'm not going to say "fault" -- because you shouldn't be here to answer on something simple like this. People below you should be executing and have enough common sense to do what courts say do.

So again -- but I don't know how else to do it. You're the man at the top of the lawsuit.

MR. OLIVER: Yes, sir.

THE COURT: It's not the Governor's problem. It's your problem. And you're the Defendant, number one, and that's why you were called up here and held up here.

So I hope -- and, again, I'm not making any sort of fact-finding. I don't know anything. You and I heard the same thing today. But if that's the kind of stuff that's going on, that is just Mickey Mouse, people, you know, on a power trip, and that ought to be cleaned up.

You know, prisoners don't deserve an easy life. I'm not trying to say that, but they deserve to be treated fairly.

MR. OLIVER: Absolutely.

THE COURT: And if you tell somebody, prisoners included, that you're going to do X, then you ought to do X. It's just that simple. I know you agree with that?

MR. OLIVER: Yes, sir, I do.

THE COURT: Thank you so very much, sir.

Ms. Crowder, you got anything else for me?

MS. CROWDER: No. Thank you, Judge.

THE COURT: Mr. Benning, I don't know -- is there anything else you want to tell me?

MR. BENNING: No, sir. I would like to commend to you, Ms. Crowder in taking action in this case in an honorable and straightforward way, she has been aboveboard over my experience.

THE COURT: Well, I'm sure she appreciates that, and so do I. I'm sorry -- I mean, she's just got to do what lawyers do sometimes, and all lawyers have been there. You know, you've got to be there for your client, and that's the way it is.

Let me say this to you -- I don't have to say it, Mr. Benning, because you're very good at communicating with the courts. But you're a pretty good lawyer. You've done a fair job. Just let me know, by way of motion or whatever else

you're normally going to do, on this.

I'm just going to grant the order. Mr. Benning and Ms. Crowder, while you both are here, is there any objection to me having just a short order that grants it?

MS. CROWDER: None from me, Judge.

MR. BENNING: None from me.

THE COURT: Okay with you, Mr. Benning?

MR. BENNING: None from me.

THE COURT: I mean, we've got a record. If there were to be another -- you know, the next step would be a contempt hearing, as far as I'm concerned. And I've got a record of all this. Tammy is here, taking it down. I don't know that there's any value in putting out -- I mean writing all this down, in my mind.

MS. CROWDER: I'm a fan of brevity, Judge.

THE COURT: In this case, I'm sure you are. But I think we will just have a short order that says the Court held a hearing, the Defendants responded, and they are ordered, once again, to comply.

MS. CROWDER: Thank you, Judge.

MR. BENNING: Yes, sir.

THE COURT: Have a great day.

MS. CROWDER: Thank you, Judge.

THE COURT: Do you want this in the record -- I tell you what I'm going to do. I'm going to mark these two as

Exhibit 2 for this hearing. It is the policy, and it's the appeal I mentioned of *Moore v. Smith*.

MS. CROWDER: Okay.

THE COURT: I'm just going to mark those as the Court's Exhibits 1 and 2. Any objections to that?

MR. BENNING: No, sir.

THE COURT: Ms. Crowder?

MS. CROWDER: No, Judge.

THE COURT: Thank you-all. Have a good day.

(Proceedings concluded at 10:37 a.m.)

END OF RECORD

CERTIFICATE OF OFFICIAL REPORTER

I, Tammy W. DiRocco, Federal Official Court Reporter in and for the United States District Court for the Middle District of Georgia, do hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 3rd day of March 2026

Tammy W. DiRocco

__________________________________
Tammy W. DiRocco CCR, CVR
Federal Official Court Reporter